1
2
3
4
5
6
7
8
9
10

**UNITED STATES DISTRICT COURT**

**EASTERN DISTRICT OF CALIFORNIA**

| | | |
|---|---|---|
| CHRISTINE MCKINLEY, | ) | Case No.: 1:15-cv-01078 - JLT |
| | ) | |
| Plaintiff, | ) | ORDER REMANDING THE ACTION PURSUANT |
| | ) | TO SENTENCE FOUR OF 42 U.S.C. § 405(g) |
| v. | ) | |
| | ) | ORDER DIRECTING ENTRY OF JUDGMENT IN |
| CAROLYN W. COLVIN, | ) | FAVOR OF PLAINTIFF CHRISTINE MCKINLEY |
| Acting Commissioner of Social Security, | ) | AND AGAINST DEFENDANT CAROLYN |
| | ) | COLVIN, ACTING COMMISSIONER OF SOCIAL |
| | ) | SECURITY |
| Defendant. | ) | |
| | ) | |

Christine McKinley asserts she is entitled to supplemental security income under Title XVI of the Social Security Act. Plaintiff argues the administrative law judge erred in evaluating the record and seeks judicial review of the decision to deny her applications for benefits. Because the ALJ failed to identify legally sufficient reasons for rejecting the opinion of Plaintiff's treating physician, the decision is **REMANDED** for further proceedings.

## PROCEDURAL HISTORY

Plaintiff filed her application for benefits on March 12, 2012, alleging disability beginning on July 30, 2011. (Doc. 13-7 at 4) The Social Security Administration denied Plaintiff's application at both the initial level and upon reconsideration. (*See* Doc. 13-5 at 2-32) After requesting a hearing, Plaintiff testified before an ALJ on October 28, 2013. (Doc. 13-4 at 19) The ALJ determined Plaintiff was not disabled and issued an order denying benefits on December 9, 2013. (*Id.* at 19-30) When the

1 | Appeals Council denied Plaintiff's request for review of the decision on May 14, 2015 (*id.* at 2-4), the

2 | ALJ's findings became the final decision of the Commissioner of Social Security ("Commissioner").

3 | **STANDARD OF REVIEW**

4 | District courts have a limited scope of judicial review for disability claims after a decision by

5 | the Commissioner to deny benefits under the Social Security Act. When reviewing findings of fact,

6 | such as whether a claimant was disabled, the Court must determine whether the Commissioner's

7 | decision is supported by substantial evidence or is based on legal error. 42 U.S.C. § 405(g). The

8 | ALJ's determination that the claimant is not disabled must be upheld by the Court if the proper legal

9 | standards were applied and the findings are supported by substantial evidence. *See Sanchez v. Sec'y of*

10 | *Health & Human Serv.*, 812 F.2d 509, 510 (9th Cir. 1987).

11 | Substantial evidence is "more than a mere scintilla. It means such relevant evidence as a

12 | reasonable mind might accept as adequate to support a conclusion." *Richardson v. Perales*, 402 U.S.

13 | 389, 401 (1971) (quoting *Consol. Edison Co. v. NLRB*, 305 U.S. 197 (1938)). The record as a whole

14 | must be considered, because "[t]he court must consider both evidence that supports and evidence that

15 | detracts from the ALJ's conclusion." *Jones v. Heckler*, 760 F.2d 993, 995 (9th Cir. 1985).

16 | **DISABILITY BENEFITS**

17 | To qualify for benefits under the Social Security Act, Plaintiff must establish he is unable to

18 | engage in substantial gainful activity due to a medically determinable physical or mental impairment

19 | that has lasted or can be expected to last for a continuous period of not less than 12 months. 42 U.S.C. §

20 | 1382c(a)(3)(A). An individual shall be considered to have a disability only if:

21 |
22 | his physical or mental impairment or impairments are of such severity that he is not only unable to do his previous work, but cannot, considering his age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy, regardless of whether such work exists in the immediate area in which he lives, or whether a specific job vacancy exists for him, or whether he would be hired if he applied for work.

23 |
24 |

25 | 42 U.S.C. § 1382c(a)(3)(B). The burden of proof is on a claimant to establish disability. *Terry v.*

26 | *Sullivan*, 903 F.2d 1273, 1275 (9th Cir. 1990). If a claimant establishes a prima facie case of disability,

27 | the burden shifts to the Commissioner to prove the claimant is able to engage in other substantial

28 | gainful employment. *Maounois v. Heckler*, 738 F.2d 1032, 1034 (9th Cir. 1984).

2

**ADMINISTRATIVE DETERMINATION**

To achieve uniform decisions, the Commissioner established a sequential five-step process for evaluating a claimant's alleged disability.  20 C.F.R. §§ 404.1520, 416.920(a)-(f).  The process requires the ALJ to determine whether Plaintiff (1) engaged in substantial gainful activity during the period of alleged disability, (2) had medically determinable severe impairments (3) that met or equaled one of the listed impairments set forth in 20 C.F.R. § 404, Subpart P, Appendix 1; and whether Plaintiff (4) had the residual functional capacity ("RFC") to perform to past relevant work or (5) the ability to perform other work existing in significant numbers at the state and national level.  *Id.*  The ALJ must consider testimonial and objective medical evidence.  20 C.F.R. §§ 404.1527, 416.927.

**A.  Medical Evidence**

In April 2010, Plaintiff underwent an MRI on her lumbar spine, following reports of back pain.  (Doc. 13-13 at 2)  Dr. Michael Dumars found "a broad-based posterior disc protrusion" and "[m]ild facet degeneration" at the L5-S1 level.  (*Id.*)  In addition, he opined Plaintiff had a "mass effect upon … the S1 nerve root," where Plaintiff had "[m]inimal edema and swelling."  (*Id.*)  Further, Dr. Dumars opined Plaintiff had "mild segmental narrowing of the canal with facet arthropathy" at the L5-S1 level.  (*Id.*)

In September 2010, Plaintiff had another MRI on her lumbar spine.  (Doc. 13-13 at 4-5)  According to Dr. Dumars, who compared the results with those from April 2010, Plaintiff's "L5-S1 level [was] again… remarkable for moderate facet degeneration." (*Id.* at 4)  Further, Dr. Dumars found:

> There is desiccation of the intervertebral disc at [L5-S1] level.  Posterior disc protrusion appears similar in appearance to the prior exam with mass effect upon the anterior aspect of the thecal sac.  Mild narrowing of the lateral recess, left greater than right.  Mild foraminal narrowing is appreciated.  Broad based disc protrusion measures approximately 6.0 mm in maximum AP diameter.  Mild ligamentum flavum hypertrophy is noted.

(*Id.*)

Dr. Deborah von Bolshwing conducted a mental status disability evaluation on June 2, 2012.  (Doc. 13-12 at 65)  Plaintiff "reported symptoms of depression and anxiety," including "vegetative symptoms," worrying, and tension.  (*Id.*)  Plaintiff told Dr. von Bolshwing that "her psychiatric symptoms have increased since her medical problems have worsened."  (*Id.*) She said her physical problems included "urinary incontinence, kidney stones, and hypertension."  (*Id.* at 66)  Dr. von

Bolshwing observed that Plaintiff walked with a "slowed" gait, with a cane, and "appeared to be in pain." (*Id.*) Dr. von Bolshwing noted that she asked Plaintiff to describe any manic or hypomanic symptoms, and Plaintiff was unable to do so. (*Id.* at 65) Plaintiff told Dr. von Bolshwing that she last worked in 2002 and "was fired due to poor attendance." (*Id.* at 66) According to Dr. von Bolshwing,

> On the Mental Status Examination the claimant was alert and oriented. Her memory for immediate, recent and remote events appeared to be adequate. Her general fund of knowledge appeared to be below average. Her insight and judgment was intact. Her ability to form abstract ideas was adequate. Her thought process was linear and there was no impairment with regard to thought content. There was no evidence of hallucinations or delusions.

(*Id.*) Dr. von Bolshwing concluded Plaintiff was capable of understanding, remembering, and carrying out simple instructions, and had a "[m]ild [i]mpairment" with complex instructions. (*Id.* at 67) Further, Dr. von Bolshwing opined Plaintiff had a "[m]ild [i]mpairment" with maintain attention and concentration during the evaluation, maintaining an adequate pace, and enduring the stress of the interview. (*Id.*) She believed Plaintiff had a "[m]arked [i]mpairment" with adapting to changes in routine work-related settings and interacting with the public, supervisors, and coworkers. (*Id.*)

On July 5, 2012, Plaintiff had an MRI on her thoracic spine. (Doc. 13-13 at 7) Dr. Serge Djukic found "[d]isc space narrowing … at T5-6, T6-7, T7-8, T8-9, and T9-10, consistent with mild degenerative disc disease." (Doc. 13-13 at 7) In addition, Dr. Djukic found "a small disc protrusion… with mild flattening of the cord" at T5-6, and "a small disc protrusion…without significant flattening of the thecal sac" at T6-7. (*Id.* at 8) According to Dr. Djukic, there was "[n]o evidence for dominant central canal spinal stenosis." (*Id.*)

Dr. Greg Ikawa reviewed the medical record and a prior ALJ decision on July 16, 2012. (Doc. 13-5 at 9) Dr. Ikawa determined that Plaintiff's limitations with activities of daily living were "due to physical issues primarily." (*Id.* at 9, 11) He indicated that while Plaintiff had an affective disorder and anxiety disorder, they were "not severe." (*Id.* at 10) According to Dr. Ikawa, Plaintiff showed mild restrictions with activities of daily living; no difficulty in maintaining social functioning; and no difficulty in maintain concentration, persistence, or pace. (*Id.*)

On July 20, 2012, Plaintiff visited the emergency department of Memorial Medical Center in Modesto, "for evaluation of back pain radiating to [her] left leg." (Doc. 13-13 at 11) Plaintiff reported

she did not have any "numbness, weakness, or bowel/urinary incontinence." (*Id.*)  Plaintiff said she

"used to be seen by [a] pain specialist, [but] not any longer." (*Id.*)  She described the current severity of

her pain as "mild," and she had a "[v]ery light spasm in [her] lower back." (*Id.* at 11, 13)

In November 2012, Plaintiff had an MRI of her cervical spine.  (Doc. 13-12 at 102; Doc. 13-13

at 9-10)  Dr. Djukic found "[s]traightening of the cervical spine… with loss of the normal cervical

lodrdosis," which was possibly caused by muscle spasm.  (*Id.*)  At Plaintiff's C5-6 level, Dr. Djukic

found "mild uncovertebral joint disease," "[a] small broad-based protrusion," and "mild flattening of

the thecal sac." (*Id.*)  In addition, at the C6-7 level, Plaintiff had "a moderate-size broad-based

protrusion…, which causes mass effect upon the cord, which causes mild to moderate central canal

spinal stenosis." (Doc. 13-12 at 103)  Dr. Djuick opined that Plaintiff's C2-3, C3-4, C4-5, and C7-71

levels were "unremarkable." (*Id.* at 102-03; Doc. 13-13 at 9-10)

In January 2013, Dr. Robert Craig began treating Plaintiff.  (Doc. 13-14 at 15)  Plaintiff

reported she had a history of depression, and suffered from back pain beginning in 2009.  (*Id.*)  Dr.

Craig noted Plaintiff described her pack pain as progressing from her neck down her back on the left

side.  (*Id.*)  The next month, Plaintiff continued to complain of neck pain and requested labs be taken by

Dr. Craig.  (Doc. 13-14 at 14)  Plaintiff reported she previously had an epidural injection in her C-

spine.  (*Id.*)  Dr. Craig referred Plaintiff to have a "neurosurgical referral, ASAP." (*Id.*)

Dr. Jane Buerger reviewed the medical record on February 20, 2013.  (Doc. 13-5 at 24)

According to Dr. Buerger, Plaintiff suffered from an affective disorder and an anxiety-related disorder.

(*Id.* at 25)  However, she found Plaintiff showed no difficulty in maintaining social functioning; no

difficulties in maintaining concentration, persistence, or pace; and mild restriction of activities of daily

living.  (*Id.*)  Dr. Beurger concluded Plaintiff's mental impairments were not severe, and affirmed the

prior decision.  (*Id.*)

In March and April 2013, Plaintiff reported she had back pain, "body fatigue," and depression.

(Doc. 13-14 at 10-11)  Dr. Craig noted Plaintiff wanted to try a different medication, and he prescribed

Celexa.  (*Id.* at 10)  In May, Plaintiff continued to report pain, stating it caused her to wake up several

times during the night.  (*Id.* at 9)  Dr. Craig opined Plaintiff had "chronic cervical disk disease [with]

radiculopathy," "chronic low back pain," and "major depression." (*Id.*)  He referred her to counseling,

1    which she began on May 16, 2013.  (*Id.*)

2         In June 2013, Dr. Craig noted that Plaintiff had an increase in her neck pain and weakness, and

3    a decreased sensation in her lower extremities.  (Doc. 13-14 at 8)  Plaintiff was scheduled for cervical

4    discectomy and fusion on July 1, 2013.  (*Id.* at 7-8; Doc. 13-4 at 26)

5         On August 5, 2013, Dr. Craig noted Plaintiff was "doing better moving [her] upper ext[remities]

6    but continued to have the same weakness in her hands and arm."  (Doc. 13-14 at 6)  Dr. Craig indicated

7    Plaintiff reported the "same pain but <u>is</u> better."  (*Id.*, emphasis in original)  He observed that Plaintiff's

8    surgical site was clean and healing well.  (*Id.*)

9         On August 6, 2013, Plaintiff visited the emergency room of Memorial Medical Center,

10   reporting she was "ejected after riding a scooter" and suffered a loss of consciousness.  (Doc. 13-13 at

11   23)  She was "[u]nable to move [her] 4 extremities," but her "[s]ymptoms improved after 5 minutes."

12   (*Id.*)  In addition, Plaintiff complained of "neck pain and bilateral shoulder/extremity pain with

13   radiculopathy."  (*Id.*)  A CT scan of Plaintiff's cervical spine showed "straightening of the normal

14   cervical lordosis" and "mild degenerative changes" at the C6-7 level.  (*Id.* at 29)  Plaintiff was

15   diagnosed with a concussion and acute cervical strain.  (*Id.* at 25)

16        Dr. Craig completed a questionnaire regarding Plaintiff's impairments on August 16, 2013.

17   (Doc. 13-14 at 2-3)  He opined Plaintiff's impairments—including cervical disc disease, severe cervical

18   radiculopathy, cervical spondylolysis at the C6/C7 level with myelopathy, and degenerative joint

19   disease of the back—precluded her from performing full-time work at any exertion level.  (*Id.* at 2)

20   Dr. Craig the opinion was based upon a "lack of grip strength," decreased gross motor function/

21   coordination, and a reflex response of 3/5.  (*Id.*)  In addition, he noted that Plaintiff had "[p]roblems

22   using [her] hands, weakness" and she dropped things.  (*Id.*)  Dr. Craig believed Plaintiff was able to sit

23   for one hour and stand/walk for three hours in an eight-hour day.  (*Id.*)  Further, Dr. Craig opined

24   Plaintiff could lift up to two pounds frequently and five pounds occasionally.  (*Id.* at 3)  According to

25   Dr. Craig, in an eight-hour day, Plaintiff could reach for 5% of the workday, handle for 3%, feel for

26   3%, push/pull for 4%, and grasp for 5%.  (*Id.*)  He concluded that Plaintiff could perform these

27   manipulative activities for only 5 to 10 minutes at one time before she needed to rest her hands.  (*Id.*)

28        In October 2013, Plaintiff visited Dr. Craig for a follow upon on her pain.  (Doc. 13-14 at 4)

Plaintiff reported she continued to have pain down her arm, and the "neck pain persisted." (*Id.*)

**B.    Administrative Hearing Testimony**

Plaintiff testified at a hearing before the ALJ on October 28, 2013. (Doc. 13-4 at 37)  She reported she had an eleventh-grade education and could read, write, add, and subtract. (*Id.* at 38)  Plaintiff said she never obtained a driver's license, and she relied upon her mother for transportation. (*Id.* at 39-40)  She reported that she stopped working when she had a child, and as of the hearing date, her children were ages eleven, twenty-two, and twenty-three. (*Id.* at 39-40)  Plaintiff believed she was unable to return to the workforce, saying her "disability started in 2009." (*Id.* at 40)

She stated that due to "[l]ifting heavy furniture," she developed "a problem with the lower back and the … mid-back, and the left side of [her] leg." (Doc. 13-4 at 40)  Plaintiff testified that she was currently in pain, which she rated "[a] nine, ten," despite taking medication the day of the hearing. (*Id.* at 41)  She clarified that if the pain was "compare[d] … to a gunshot wound, it's probably a seven or eight." (*Id.* at 45)  She reported she used a cane prescribed by a physician. (*Id.* at 41)

Plaintiff reported she also suffered from depression. (Doc. 13-4 at 39)  She said she began counseling in February 2013, and attended sessions three times per week. (*Id.* at 42)  Plaintiff stated her depression caused her to "stay in bed… most of the time" and "avoid people." (*Id.*)  In addition, she said her depression made her "not eat at all," which caused a twenty-pound weight loss. (*Id.* at 39)

She testified that she spent a typical day watching "[s]oap operas, Judge shows" on television. (Doc. 13-4 at 43)  Plaintiff said she did housework with her mom, but she did not have any hobbies. (*Id.*)  She reported she attended church once a week but did not do other activities such as going to movies, the mall, fishing, hunting, or swimming. (*Id.*)  Plaintiff said "three or four" days each week, she isolated herself at home due to her depression, "[l]aying on the couch." (*Id.* at 47)  She said she did not want to interact with people, even at church, and "stopped being around anybody." (*Id.* at 50-51)

Plaintiff estimated she was able to sit for up to an hour at one time and be on her feet for an hour, using a cane. (Doc. 13-4 at 52-53)  She said she had to lie down for six hours out of an eight-hour day. (*Id.* at 52)  Plaintiff believed she could lift three pounds but could also lift a gallon of milk, which was "about eight and-a-half pounds." (*Id.* at 53)  Plaintiff said her hands "feel dead, numb," and estimated she could use her hands for things such as writing or grasping "for probably an hour or two"

1   in an eight-hour day, but for only fifteen minutes at one time.  (*Id.* at 54)   She reported she felt "[t]he

2   same" when it was extremely cold outside but "[w]orse" when it was extremely hot.  (*Id.* at 60)

3        David Dettmer, the vocational expert ("VE") testified at the hearing.  (Doc. 13-4 at 57)  The

4   ALJ asked the VE to consider a hypothetical "person of the claimant's age, education, and work

5   experience, who could do light work."  (*Id.* at 58)  In addition, the ALJ indicated the person could

6   "frequently climb ladders, ropes, or scaffolds, frequently climb ramps or stairs, frequently balance,

7   occasionally stoop, occasionally crouch occasionally kneel, [and] occasionally crawl."  (*Id.* at 58-59)

8   Further, the individual was limited to simple work "as defined in the DOT as SVP levels 1 and 2,

9   routine and repetitive," and "low stress job[s] as defined as having only occasional decision making,

10  and only occasional change in a work setting."[1]  (*Id.* at 59)  Finally, the individual was limited to "only

11  occasional interaction with the general public and … the coworkers."  (*Id.*)  The VE opined the person

12  would be able to perform Plaintiff's past work as a bodyline attendant, as well as other jobs in the

13  national economy such as office helper, DOT 239.567-010; mail clerk, DOT 209.687-026; and

14  housekeeping worker, DOT 323.687.014.  (*Id.*)

15       Next, the ALJ asked the VE to consider an individual "who has all the same limitations…but

16  also need[ed] a sit and stand option, allowing this person to stand or sit alternatively at will provided

17  this person is not off task more than five percent of the work period."  (Doc. 13-4 at 60)  The ALJ also

18  indicated the person needed "to avoid concentrated exposure to extreme heat," "concentrated use of

19  hazardous machinery, and concentrated exposure to unprotected heights."  (*Id.*)  The VE opined the

20  housekeeping and office helper positions could still be performed, and there was not "a significant

21  change in the numbers" if the worker only needed "a brief stretch break or [to] get off their feet

22  briefly."  (*Id.* at 60-61)  The VE opined a person could also perform work as a parking lot attendant,

23  with "about a 50 percent erosion just for occasional [interactions with the] public."  (*Id.* at 61)

24       Third, the ALJ asked the VE to consider a person with the same physical and mental limitations,

25  who "would have three or more unexcused, unscheduled absences… per month."  (Doc. 13-4 at 62)

26

27       [1] The *Dictionary of Occupational Titles* ("DOT") by the United States Dept. of Labor, Employment & Training

28  Admin., may be relied upon "in evaluating whether the claimant is able to perform work in the national economy." *Terry v. Sullivan*, 903 F.2d 1273, 1276 (9th Cir. 1990).  The *DOT* classifies jobs by their exertional and skill requirements, and may be a primary source of information for the ALJ or Commissioner.  20 C.F.R. § 404.1566(d)(1).

1   The VE testified he "would not see jobs [available] for somebody with those limitations.  (*Id.*)

2   **C.    The ALJ's Findings**

3       Pursuant to the five-step process, the ALJ determined Plaintiff did not engage in substantial

4   gainful activity after the application date of February 13, 2012.  (Doc. 13-4 at 21)  At step two, the

5   ALJ found Plaintiff's severe impairments included: "osteoarthritis, status post healed fracture of the

6   spine; depression; and degenerative disc disease."  (*Id.*)  At step three, the ALJ determined Plaintiff

7   did not have an impairment, or combination of impairments, that met or medically equaled a Listing.

8   (*Id.* at 21-22)  Next, the ALJ determined:

9       [T]he claimant has the residual functional capacity to perform light work as described
        in 20 CFR 416.967(b) except the claimant is able to perform a job allowing her to sit or
10      stand alternatively at will provided that she is not off task more than 5% of the work
        period; she is able to perform a job that involves no more than frequent balancing or
11      climbing, and  no more than occasional stooping, crouching, kneeling, or crawling; she
        must avoid concentrated exposure to extreme heat, the use of hazardous machinery, and
12      exposure to unprotected heights; she is limited to work that is simple as defined in the
        DOT as SVP levels 1 and 2, with routine and repetitive tasks; she is able to perform
13      low stress work, meaning jobs with only occasional decision making and only
        occasional changes in the work setting; and she is able to perform work involving no
14      more than occasional interaction with the general public and co-workers.

15  (*Id.* at 23)  Based upon this RFC, the ALJ concluded Plaintiff was "unable to perform any past

16  relevant work."  (*Id.* at 28)  However, the ALJ determined "there are other jobs existing in the national

17  economy that the claimant can perform." (*Id.* at 29)  Consequently, the ALJ found Plaintiff was not

18  disabled as defined by the Social Security Act. (*Id.* at 29-30)

19                          **DISCUSSION AND ANALYSIS**

20      Plaintiff contends the ALJ erred in her evaluation of the medical record and the limitations

21  articulated by Drs. von Bolschwing and Craig.  (Doc. 20 at 7-15)  According to Plaintiff, "The ALJ

22  failed to include all the limitations" identified by Dr. von Bloschwing in the RFC.  (*Id.* at 12, emphasis

23  omitted)  Further, Plaintiff argues the ALJ did not identify "a legally sufficient reason" reason to reject

24  the opinion of her treating physician, Dr. Craig.  (*Id.*)

25      **A.    Evaluation of the Medical Evidence**

26      In this circuit, the courts distinguish the opinions of three categories of physicians: (1) treating

27  physicians; (2) examining physicians, who examine but do not treat the claimant; and (3) non-

28  examining physicians, who neither examine nor treat the claimant.  *Lester v. Chater*, 81 F.3d 821, 830

1   (9th Cir. 1996).  In general, the opinion of a treating physician is afforded the greatest weight but it is

2   not binding on the ultimate issue of a disability.  *Id.*; *see also* 20 C.F.R. § 404.1527(d)(2); *Magallanes*

3   *v. Bowen*, 881 F.2d 747, 751 (9th Cir. 1989).  Further, an examining physician's opinion is given more

4   weight than the opinion of non-examining physician.  *Pitzer v. Sullivan*, 908 F.2d 502, 506 (9th Cir.

5   1990); 20 C.F.R. §§ 404.1527(d)(2), 416.927(d)(2).

6       A physician's opinion is not binding upon the ALJ and may be discounted whether or not

7   another physician contradicts the opinion.  *Magallanes*, 881 F.2d at 751.  An ALJ may reject an

8   *uncontradicted* opinion of a treating or examining medical professional only by identifying "clear and

9   convincing" reasons.  *Lester*, 81 F.3d at 831.  In contrast, a *contradicted* opinion of a treating or

10  examining professional may be rejected for "specific and legitimate reasons that are supported by

11  substantial evidence in the record."  *Id.*, 81 F.3d at 830.  When there is conflicting medical evidence, "it

12  is the ALJ's role to determine credibility and to resolve the conflict."  *Allen v. Heckler*, 749 F.2d 577,

13  579 (9th Cir. 1984).  The ALJ's resolution of the conflict must be upheld when there is "more than one

14  rational interpretation of the evidence."  *Id.; see also Matney v. Sullivan*, 981 F.2d 1016, 1019 (9th Cir.

15  1992) ("The trier of fact and not the reviewing court must resolve conflicts in the evidence, and if the

16  evidence can support either outcome, the court may not substitute its judgment for that of the ALJ").

17              1.       Opinion of Dr. von Bolschwing and Plaintiff's mental RFC

18      The ALJ observed that Dr. von Bolschwing diagnosed Plaintiff "with dysthymic disorder,

19  generalized anxiety disorder, and a GAF of 55-60."[2]  (Doc. 13-4 at 26)  The ALJ believed the findings

20  of Dr. von Bolschwing were "somewhat extreme when compared to her examination report and the

21  remainder of the evidence of record with respect to the claimant's cognitive and psychiatric

22  functioning."  (*Id.*)  Nevertheless, the ALJ indicated the opinion was "given significant weight in

23  consideration of the impact the claimant's physical pain has on her mental functioning overall."  (*Id.*)

24      Plaintiff acknowledges that "[t]he ALJ accepted the opinion of Dr. Von Bolschwing and

25

26  ───────────────

27  [2] GAF scores range from 1-100, and in calculating a GAF score, the doctor considers "psychological, social, and occupational functioning on a hypothetical continuum of mental health-illness."  American Psychiatric Association, *Diagnostic and Statistical Manual of Mental Disorders*, 34 (4th ed.) ("DSM-IV).  A GAF score of 51-60 indicates

28  "moderate symptoms (e.g., flat affect and circumstantial speech, occasional panic attacks) OR moderate difficulty in social, occupational, or school functioning (e.g., few friends, conflict with peers or co-workers)."  *Id.*

provided it significant weight," but argues the ALJ failed to include the limitation related to Plaintiff's ability to interact with supervisors in the RFC.  (Doc. 20 at 13)  Specifically, Dr. von Bolschwing opined Plaintiff had a "[m]arked [i]mpairment" with interacting with the public, supervisors, and coworkers.  (Doc. 13-12 at 67)  Plaintiff contends the ALJ did not reject the limitation related to supervisors, "but inexplicably did not include this limitation into the RFC."  (Doc. 20 at 13)

According to Plaintiff, a "'marked limitation is one well beyond the 'occasional' requirement that the ALJ put forth," because a marked limitation seriously interferes "with [the] ability to independently initiate, sustain, or complete activities."  (Doc. 20 at 13, quoting POMS DI 25225.020[3]) As Plaintiff observes, the Ninth Circuit determined "an ALJ appropriately took into account a Plaintiff's 'marked limitations in social functioning' by 'limiting [him] to work in which there is no public contact.'"  (*Id.*, quoting *Turner v. Comm'r of Social Sec.*, 613 F.3d 1217 (9th Cir. 2010)). Therefore, Plaintiff contends the ALJ erred by failing to "properly explain why the limitation of marked public and co-worker contact was translated as only 'occasional' in the RFC."  (*Id.* at 13)  In addition, Plaintiff asserts "the complete disregard" of Dr. von Bolschwing's opinion related to "marked limitation in interaction with supervisors violates the law."  (*Id.* at 13-14)

Significantly, however, Plaintiff overlooks the findings of the ALJ related to Plaintiff's social functioning.  The ALJ concluded Plaintiff had "*moderate* difficulties" with social functioning.  (Doc. 13-4 at 22, emphasis added)  In doing so, the ALJ found "the treatment records do not show more than moderate difficulty in this area of functioning."  (*Id.*)  Further, the ALJ observed that Drs. Ikawa and Buerger "found no restriction in the claimant's social functioning."  (*Id.*)  Thus, the ALJ rejected the "marked" social functioning restrictions identified by Dr. von Bolschwing, which the ALJ found were "extreme" when compared to the generally "normal" results of the mental status examination.  (*Id.* at 26)  Rather, the ALJ gave "great weight" to the findings of Drs. Ikawa and Buerger, finding the assessments were "consistent with the evidence of record."[4]  (*Id.* at 27-28)  Indeed, these opinions were consistent with the GAF score of 55-60 given by Dr. von Bolschwing, indicating Plaintiff had

---

[3] The Program Operations Manual System (POMS) is an internal agency manual.  However, POMS "does not impose judicially enforceable duties on either [the] court or the ALJ." *Carillo-Yeras*, 671 F.3d 731, 735 (9th Cir. 2001); *see also  Moore v. Apfel*, 216 F.3d 864, 868-69 (9th Cir. 2000) (holding POMS "does not carry the force and effect of law").
[4] Notably, the opinions of examining physicians can constitute substantial evidence in the record when consistent with other independent evidence in the record.  *Tonapetyan v. Halter*, 242 F.3d 1144, 1149 (9th Cir. 2001).

1    "moderate" symptoms.  *See DSM-IV* at 34.

2           Where, as here, a claimant has "moderate mental residual functional capacity limitations," an

3    RFC of unskilled work encompasses these limitations.  *See e.g, Thomas v. Barnhart,* 278 F.3d 947,

4    953, 955 (9th Cir. 2002).  Similarly, the Ninth Circuit concluded a limitation to "simple, routine,

5    repetitive" tasks accommodated physicians' findings that a claimant had "a slow pace" and "several

6    moderate limitations in other mental areas." *Stubbs-Danielson v. Astrue*, 539 F.3d 1169 (9th Cir. 2008);

7    *see also Sabin v. Astrue*, 337 Fed. App'x 617, 620-21 (9th Cir. 2009) (finding the ALJ properly

8    assessed the medical evidence when finding that—despite moderate difficulties as to concentration,

9    persistence, or pace—the claimant could perform simple and repetitive tasks on a consistent basis).

10          Likewise, a limitation to simple tasks addresses a claimant's limitations with social functioning

11   and adaptation.  *See Rogers v. Comm'r of Soc. Sec. Admin.*, 490 Fed. App'x 15 (9th Cir. 2012) (holding

12   a residual functional capacity for simple routine tasks, which did not expressly note the claimant's

13   moderate limitations in interacting with others, nonetheless adequately accounted for such limitations);

14   *Langford v. Astrue*, 2008 WL 2073951 at *7 (E.D. Cal. May 14, 2008) ("unskilled work . . .

15   accommodated [the] need for 'limited contact with others'"); *Diakogiannis v. Astrue*, 975 F. Supp. 2d

16   299, 312 (W.D.N.Y. 2013) (finding the ALJ accounted for "significantly delayed adaptive behavior. . .

17   in finding that [the claimant] could perform 'simple, routine, and repetitive tasks'").  Here, the ALJ

18   expressly limited Plaintiff to "simple… routine and repetitive tasks," and only "occasional interaction

19   with the general public and co-workers."  (Doc. 13-4 at 23)  Accordingly, the mental RFC adequately

20   encompasses the findings of the ALJ regarding Plaintiff's moderate difficulties with social functioning.

21   *See Rogers*, 490 Fed. App'x 15; *Langford*, 2008 WL 2073951 at *7.

22                  2.      Opinion of Dr. Craig[5]

23          The ALJ gave "little weight" to the opinion of Dr. Craig because "the treatment relationship

24   between Dr. [Craig] and the claimant [was] very narrow."  (Doc. 13-4 at 27)  The ALJ also indicated

25   that the opinion was given less weight because "recent medical records consistently show full strength

26   and range of motion throughout the claimant's body, with normal ambulation and neurological

27   functioning."  (*Id.*, citing, Exh. B14F and B17F)  Plaintiff argues these were not "legally sufficient

28   _____
     [5] The ALJ erroneously refers to Dr. Craig as Dr. Crave.  (*See* Doc. 13-4 at 27)

1    reason[s]" for rejecting Dr. Craig's opinion.  (Doc. 20 at 12)

2                           *a.*    *Nature of the treating relationship*

3          Importantly, the ALJ fails to explain how the "narrow" relationship between Dr. Craig and

4    Plaintiff supports the decision to give the opinion less weight.  The fact that Dr. Craig treated Plaintiff

5    for her physical impairments alone is not a specific and legitimate reason for rejecting his opinion.

6    *See Bales v. Colvin*, 2015 WL 2401335 at *12 (D. Org. May 19, 2015) (finding the ALJ's decision to

7    give "little weight" to the opinion of a treating physician because it "appear[ed] to be based on a rather

8    narrow treatment relationship with the claimant" was an error).

9                           *b.*    *Inconsistencies with the record*

10         The Ninth Circuit determined an ALJ may give less weight to the opinion of a physician when

11   an ALJ finds inconsistencies with the physician's records, *and* the ALJ explains why the opinion "did

12   not mesh with [his] objective data or history."  *Tommasetti v. Astrue*, 533 F.3d 1035, 1041 (9th Cir.

13   2008).  Similarly, inconsistency with the overall record constitutes a legitimate reason for discounting a

14   physician's opinion.  *Morgan v. Comm'r of the SSA*, 169 F.3d 595, 602-03 (9th Cir. 1999).  However,

15   to reject an opinion as inconsistent with the treatment notes or medical record, the "ALJ must do more

16   than offer his conclusions."  *Embrey v. Bowen*, 849 F.2d 418, 421 (9th Cir. 1988).  The Ninth Circuit

17   explained: "To say that medical opinions are not supported by sufficient objective findings or are

18   contrary to the preponderant conclusions mandated by the objective findings does not achieve the level

19   of specificity our prior cases have required."  *Id.*, 849 F.2d at 421-22.

20         Here, the ALJ failed to identify any specific inconsistencies between the findings of Dr. Craig

21   and the treatment notes, or identify specific findings in the record.  Rather, the ALJ cites broadly to

22   two exhibits—B14F and B17F—which include more than 50 pages of records.  (*See* Doc. 13-4 at 27)

23   In doing so, the ALJ fails to identify specific conflicts in the record and to resolve the conflict.  *See*

24   Allen, 749 F.2d at 579; *Embrey*, 849 F.2d at 421.  Because the ALJ did no more than offer her

25   conclusions that the opinion of Dr. Craig was inconsistent with the remainder of the record, the

26   purported inconsistencies do not support the decision to give less weight to the opinion.

27         **B.    Remand is Appropriate**

28         The decision whether to remand a matter pursuant to sentence four of 42 U.S.C. § 405(g) or to

                                                  13

order immediate payment of benefits is within the discretion of the district court. *Harman v. Apfel*, 211 F.3d 1172, 1178 (9th Cir. 2000). Except in rare instances, when a court reverses an administrative agency determination, the proper course is to remand to the agency for additional investigation or explanation. *Moisa v. Barnhart*, 367 F.3d 882, 886 (9th Cir. 2004) (citing *INS v. Ventura*, 537 U.S. 12, 16 (2002)). Generally, an award of benefits is directed when:

> (1) the ALJ has failed to provide legally sufficient reasons for rejecting such evidence, (2) there are no outstanding issues that must be resolved before a determination of disability can be made, and (3) it is clear from the record that the ALJ would be required to find the claimant disabled were such evidence credited.

*Smolen v. Chater*, 80 F.3d 1273, 1292 (9th Cir. 1996). In addition, an award of benefits is directed where no useful purpose would be served by further administrative proceedings, or where the record is fully developed. *Varney v. Sec'y of Health & Human Serv.*, 859 F.2d 1396, 1399 (9th Cir. 1988).

Here, the ALJ failed to identify specific and legitimate reasons for giving rejecting the opinion of Dr. Craig related to Plaintiff's physical impairments. Therefore, the matter should be remanded for the ALJ to re-evaluate the medical evidence to determine Plaintiff's physical residual functional capacity. *See Moisa* , 367 F.3d at 886.

## CONCLUSION AND ORDER

For the reasons set forth above, the Court finds the ALJ erred in assessing the opinion of Plaintiff's treating physician, and the administrative decision should not be upheld by the Court. *See Sanchez*, 812 F.2d at 510. Accordingly, the Court **ORDERS**:

1. Pursuant to sentence four of 42 U.S.C. § 405(g), this matter is **REMANDED** for further proceedings consistent with this decision; and

2. The Clerk of Court **IS DIRECTED** to enter judgment in favor of Plaintiff Christine McKinley and against Defendant Carolyn W. Colvin, Acting Commissioner of Social Security.

IT IS SO ORDERED.

Dated:   __January 23, 2017__                         _____/s/ Jennifer L. Thurston_____
                                                     UNITED STATES MAGISTRATE JUDGE

14